# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **PAUL ELTON FLETCHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **No. 18-2085-KHV** |
| | ) | |
| **KILOLO KIJAKAZI,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff appeals the final decision of the Commissioner of Social Security to deny disability and disability insurance benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. § 401, *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the SSA.  For reasons stated below, the Court affirms the decision of the Commissioner.

## Procedural Background

In late May of 2014, plaintiff protectively filed applications for disability insurance benefits and supplemental security income.  Plaintiff initially claimed a disability onset date of September 10, 2010.  See Administrative Record (Doc. #8-1) filed June 1, 2018 ("Tr. 1") at 68, 214.

The agency denied plaintiff's benefit applications both initially and on reconsideration. Plaintiff appealed to this Court, which reversed the Commissioner's decision and remanded for further proceedings.  Memorandum And Order (Doc. #13) filed August 9, 2019.  Specifically, this Court reversed and remanded the Commissioner's decision under sentence six of 42 U.S.C.

---

[1]    On July 9, 2021, Kilolo Kijakazi was appointed Acting Commissioner of the Social Security Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for former Commissioner Andrew M. Saul as defendant in this suit.

§ 405(g) for defendant to consider the opinion of Elizabeth Garton, a psychiatric mental health nurse practitioner ("PMHNP").  Id. at 12–13.  In turn, the appeals counsel remanded the case to the administrative law judge ("ALJ").  Social Security Administrative Record (Doc. #20) filed August 17, 2020 ("Tr. 2") at 928.

On February 26, 2020, the ALJ held a second hearing.  At this hearing, plaintiff amended his alleged onset date to March 1, 2013.  Tr. 2 at 835, 863.  On March 18, 2020, the ALJ again concluded that plaintiff was not under a disability as defined in the SSA and that he was not entitled to benefits.  Tr. 2 at 835–50. On August 17, 2020, the Commissioner filed the remand record. Social Security Administrative Record (Doc. #20).  On October 15, 2020, plaintiff amended his complaint to include the adverse decision of March 18, 2020.  Amended Complaint (Doc. #22). On February 19, 2021, plaintiff filed his opening brief.

## Factual Background

The following is a brief summary of the factual record.

Plaintiff is 38 years old.  While plaintiff worked after the amended alleged disability onset date, March 1, 2013, plaintiff's work did not rise to the level of substantial gainful activity.  Tr. 2, 838.  Plaintiff alleges that he is disabled due to degenerative disc disease of the lumbar spine, right shoulder impingement, right carpal tunnel syndrome, obesity, depression and anxiety.  Plaintiff's Initial Brief (Doc. #27) at 1.  Plaintiff has past relevant work as a semi-truck driver, construction laborer, automobile mechanic, building maintenance manager and horse tender.  Tr. 2, 848.

In December of 2005, plaintiff visited Dr. Roeder complaining of pain in his right shoulder. Tr. 1, 378–80.  Dr. Roeder ordered an MRI arthrogram.  Tr. 1, 378.  On January 12, 2006, Dr. Roeder reviewed plaintiff's MRI and found no tearing in plaintiff's shoulder.  Tr. 1, 377.  As a result, Dr. Roeder wrote that there was "no reasonable chance" that surgery would help plaintiff,

and he suggested a "structured program of therapy."  Tr. 1, 377.  On May 9, 2013, plaintiff visited advanced practice registered nurse ("APRN") Gregory King complaining of right shoulder pain. Tr. 1, 551–52.  On June 6, 2013, plaintiff again visited APRN King complaining of right shoulder pain and pain that radiated to his right hand.  Tr. 1, 551.  Plaintiff also stated that his right fingers tingled.  Tr. 1, 551.  On June 27, 2013, plaintiff returned to APRN King, complaining of only minimal soreness in his shoulder.  Tr. 1, 550.  APRN King noted that plaintiff had severe right carpal tunnel syndrome and right ulnar tunnel syndrome.  Tr. 1, 550.  APRN King and plaintiff discussed surgery to relieve the right carpal and ulnar tunnel. On July 16, 2013, plaintiff had surgery.  Tr. 1 533–34, 549–50.  Plaintiff was pleased with the results.  Tr. 1, 548.

On February 26, 2015, plaintiff reported to APRN King for right shoulder pain, pain in his lower back and pain in his right leg.  Tr. 1, 648.  APRN King stated that plaintiff's shoulder and back exams were "rather benign" and that plaintiff could "perform any function that he needs and wants to do."  Tr. 1, 649, 697–98.  On June 8, 2015, plaintiff saw Dr. Marianne Ray and had no complaints about his shoulder.  Tr. 1, 645.  On August 5, 2016, plaintiff noted that he had "much less pain all over, except when he does too much" and had no complaints.  Tr. 1, 725.

On May 25, 2018 plaintiff saw APRN Karl Kroen to establish care, as he had not seen a doctor in months.  Tr. 2, 1243.  Plaintiff complained of pain in his left shoulder.  Tr. 2, 1243.  At his appointments on May 25 and August 13, 2018, plaintiff did not complain of pain in his right shoulder.  Tr. 2, 1230, 1243.  On October 25, 2018, plaintiff complained of numbness and tingling in his left hand.  Tr. 2, 1223.  Plaintiff also had an abscess under his right arm.  Tr. 2, 1223.

On February 10, 2011, Dr. Joseph Brewster diagnosed plaintiff with diabetes.  Tr. 1, 438. On February 24 and March 17, 2011, Dr. Brewster noted that plaintiff's diabetes was poorly-controlled.  Tr. 1, 436, 437.  On May 2, 2011, Dr. Brewster noted that plaintiff's diabetes was

"probably not optimally controlled."  Tr. 1, 434.   On July 10, 2013, APRN King also noted that plaintiff's diabetes was uncontrolled.  Tr. 1, 676.   On March 15, 2015, plaintiff admitted to Dr. Ray that he was occasionally noncompliant with his diabetes medications, and Dr. Ray noted that plaintiff's diabetes was uncontrolled.  Tr. 1, 647.  On June 8, 2015 and August 5, 2016, Dr. Ray again noted that plaintiff's diabetes was uncontrolled.  Tr. 1, 645, 726.  On May 25, 2018, APRN Kroen noted that plaintiff had poor control of his diabetes.  Tr. 2, 1243.  On August 13, 2018, APRN Kroen stated that plaintiff's diabetes was "of concern."  Tr. 2, 1230.  On April 19, 2019, Dr. Brian Cooke noted that plaintiff's diabetes was "completely out of control."  Tr. 2, 1218.

On June 10, 2011, Dr. John Bustle diagnosed plaintiff with bipolar disorder.  Tr. 1, 428. On June 25, 2014, plaintiff saw nurse Garton to get medication for his bipolar disorder.  Tr. 607– 09.  Plaintiff stated that his family saw a difference in his behavior when he takes his medication and nurse practitioner Garton noted that his medications "seem to help with mood stabilization and sleep."  Tr. 1, 607.  Plaintiff also believed his medications were working well.  Tr. 1, 608.  On August 25, 2014, plaintiff saw Andrew Dillingham, a licensed masters level psychologist ("LMLP").  Tr. 1, 616.  Dillingham diagnosed plaintiff with posttraumatic stress disorder and bipolar disorder.  Tr. 1, 612.  Plaintiff told Dillingham that he continued to have trouble managing his anger, frustration and moods, but that he had seen improvement using adaptive anger management skills and spending time doing things that he enjoys.  Tr. 1, 614.  On October 22, 2014, plaintiff saw nurse Garton again.  Tr. 1, 632–33.  Plaintiff stated that his mood was stable, but that he felt depressed.  Tr. 1, 632.  On November 19, 2014, Southeast Kansas Mental Health Center, where plaintiff had been seeing therapists, closed plaintiff's counseling program because he did not attend his appointments and did not respond to an outreach letter.  Tr. 1, 634.

On June 18, 2015, plaintiff saw John Helton, a licensed clinical addiction counselor.  Tr.

1, 659.  Plaintiff wished to restart medication management and therapy.  Tr. 1, 655.  On July 15, 2015, plaintiff saw Helton again.  Tr. 751.  Plaintiff was irritable, depressed and more anxious because his doctor had reduced his medication to improve his liver function.  Tr. 1, 750–51. Plaintiff experienced difficulty with the medication change, but others saw slow improvement.  Tr. 1, 754–57.  On December 16, 2015, plaintiff saw Sherry Payne-Sisney, a licensed master social worker.  Tr. 1, 760.  Plaintiff told Payne-Sisney that things were "going good."  Tr. 760.

On June 15, 2016, nurse Garton changed plaintiff's medications.  Tr. 1, 737–38.  On August 17, 2016, plaintiff told her that the new medication was "helping to stabilize his mood" and that his "depression is not there as much."  Tr. 1, 739.  On October 12, 2016, plaintiff told her that he was "doing much better" and that he felt stable.  Tr. 2, 1103.  Plaintiff noted that he did have some nightmares, and nurse Garton prescribed a medication for them.  Tr. 2, 1103.  On January 18, 2017, plaintiff stated that he does not have nightmares as long as he takes his medication.  Tr. 2, 1105. Plaintiff noted that he felt "a little bit depressed" but felt that it was "related to the season."  Tr. 2, 1105.  On May 17, 2017, plaintiff told nurse Garton that he was doing well and offered no complaints.  Tr. 2, 1108.  On September 13, 2017, plaintiff told her that he felt "even" and is "doing well overall."  Tr. 2, 1111.  On October 6, 2017, plaintiff's urine drug screen came back negative for controlled substances.  Tr. 2, 1087.  This meant that plaintiff was not taking his medications.

On April 25, 2018, plaintiff saw nurse Garton.  Tr. 2, 1114.  Plaintiff had not seen a mental health professional for several months.  Tr. 2, 1114.  Plaintiff wanted to restart medications and therapy.  Tr. 2, 1114.

On July 17, 2018, plaintiff saw Kerry Morrell complaining of weight loss, poor hygiene, a depressed mood, decreased energy, poor motivation and loss of interest in activities, nightmares, feeling numb, enuresis and difficulty managing social groups.  Tr. 2, 1155–57.  On September 26,

2018, plaintiff told nurse Garton that he was doing better and that his depression was "there but not quite as bad."  Tr. 2, 1149.  On November 28, 2018, plaintiff told her that he was doing better.  Tr. 2, 1151.  His depression was "not too bad" and his anxiety was under control.  Tr. 2, 1151.  He had no anger outbursts and his nightmares were more infrequent.  Tr. 2, 1151.

## I.      Disability Determination Reports

On February 14, 2015, Dr. Libbie Russo reviewed plaintiff's medical record to assess his physical residual functional capacity ("RFC").  Tr. 1, 79.  Dr. Russo opined that plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand, walk or sit six hours in an eight-hour workday, frequently climb ramps or stairs, balance, kneel, stoop, crouch and crawl and occasionally climb ladders, ropes or scaffolds.  Tr. 1, 78–79.  Dr. Russo also noted that plaintiff had no manipulative, visual or communicative limitations, but that plaintiff he needed to avoid concentrated exposure to vibration.  Tr. 1, 78–79.  On July 6, 2015, Dr. Mininder Kaur reviewed plaintiff's medical record to assess his RFC and arrived at the same conclusions.  Tr. 1, 122–23, 125.

Three medical professionals, Dr. Philip Rosenshield, Dr. R. E. Schulman and PMHNP Garton provided opinions about how plaintiff's mental health symptoms would affect his ability to work.  Dr. Rosenshield and Dr. Schulman each provided one opinion while Garton provided two.  These disability determination reports are discussed in chronological order.

Drs. Rosenshield and Schulman opined that plaintiff had mild restriction of activities in daily living, mild difficulties maintaining concentration, persistence or pace, and mild difficulties maintaining social functioning.  Tr. 1, 76, 106.  Specifically, Drs. Rosenshield and Schulman opined that plaintiff's symptoms do not significantly restrict his activities of daily living.  Tr. 1, 76.  Drs. Rosenshield and Schulman also opined that plaintiff presented no evidence of "severe

cognitive or social interaction problems."  Tr. 1, 76, 107.

On the other hand, in March of 2017, PMHNP Garton opined that plaintiff had moderate limitations in his ability to understand, remember and carry detailed instructions, the ability to sustain an ordinary routine without supervision, ability to interact appropriately with the general public, ability to respond appropriately to changes in the workplace, ability to travel in unfamiliar places or use public transportation, and ability to set realistic goals or make plans independently of others.  Tr. 2, 1054–55  She also opined that plaintiff had marked limitations in ability to maintain attention and concentration for extended periods, ability to work in close proximity to others without being distracted by them, ability to accept instruction and criticism from supervisors and ability to get along with coworkers without distracting them or exhibiting behavioral extremes. Tr. 2, 1054–55.  Finally, PHMNP Garton opined that plaintiff had extreme limitations in his ability to perform activities, maintain attendance, be punctual, complete a normal workday or workweek without interruptions from his psychological symptoms and perform at a consistent pace without an unreasonable number of rest periods.  Tr. 2, 1054–55.

In May of 2017, PMHNP Garton also found that plaintiff's mental health symptoms moderately limited his ability to remember locations and work-like procedures, markedly limited his ability to travel in unfamiliar places or use public transportation.  Tr. 2, 1057–58.  In the narrative section of her second opinion, PMHNP Garton wrote that plaintiff struggles with "sleep, nightmares, depression, mood swings and anxiety" as well as maintaining concentration and attention.  Tr. 2, 1058.  She also noted that plaintiff would likely miss work often due to his inability to handle stressful situations and outbursts of anger.  Tr. 2, 1058–59.

## II.    Plaintiff's Testimony

On February 26, 2020, plaintiff testified in front of the ALJ.  Initially, plaintiff worked in

construction and as an auto mechanic.  Tr. 2, 867.  Later, plaintiff wished to become a truck driver because his impairments made it impossible for him to be a construction worker or auto mechanic. Tr. 2, 867–88.   As a result, plaintiff went to C1 truck driving school to obtain his commercial driver's license ("CDL").  Tr. 2, 864.  Plaintiff testified that he no longer has his CDL and that he can no longer drive trucks because he cannot pass the required physical exam due to diabetes.  Tr. 2, 865–66.  Plaintiff testified that he is married and has three children aged 15, 13 and 12.  Tr. 2, 865.  Plaintiff testified that while he can drive, it causes him back pain, shoulder pain and pain in his hands.  Tr. 2, 865–66.

Plaintiff testified that since his onset date, his hands tingle and go numb.  Tr. 2, 868. Plaintiff testified that he loses his grip and that he has lost a lot of strength in his right hand.  Tr. 2, 868.  Plaintiff stated that he could hold an item for five minutes before his hands start aching "really bad."  Tr. 869.  Plaintiff testified that while he had surgery for carpal tunnel syndrome, it did not help.  Tr. 2, 868.  Plaintiff testified that he does not try to type with a keyboard or do anything with his fingers.  Tr. 2, 869.

Plaintiff testified that he has back pain that is sharp, acute and radiates down his leg.  Tr. 2, 869.  Plaintiff testified that bending over worsens his back pain and that he can stand and walk for approximately ten minutes before his back begins to hurt.  Tr. 2, 869.  Plaintiff testified that he can sit for approximately 15–20 minutes before he needs to rest.  Tr. 2, 870.

Plaintiff testified that he has pain in his right arm and shoulder and that he can lift approximately 13 pounds, but that he cannot lift his arm above shoulder height without pain.  Tr. 2, 870.

Plaintiff testified that his doctors have recommended over-the-counter medications for pain, but they do not help.  Tr. 2, 876.

Plaintiff also testified that he has pain in his right leg when he walks.  Tr. 2, 872.  Plaintiff explained that the pain affects his lower back, hip, knee and ankle.

Plaintiff testified that he is not currently receiving mental health treatment, and that the last time he was in treatment was less than a year ago.  Tr. 2, 871, 875.  Plaintiff explained that he stopped seeking treatment because as soon as he got comfortable with a therapist, that therapist would leave.  Tr. 2, 875.  Plaintiff testified that this happened to him four times, and that he did not get along well with his most recent therapist.  Tr. 2, 875.  Plaintiff testified that medications help his mental health, but that he had not been taking them because his primary care physician will not prescribe them.  Tr. 2, 875.

Plaintiff testified that he does very little around his home and rests "90–95% of the time." Tr. 2, 871, 876.  Plaintiff explained that he watches TV, rests and tries to keep the house clean, but cannot clean the house continually throughout the day due to pain.  Tr. 2, 871.  Plaintiff testified that he mows the yard on his riding mower, but that he needs to rest for four to five hours afterward. Tr. 2, 874, 876.  Plaintiff does not help with the laundry and rarely cooks for his family.  Tr. 2, 874.  Plaintiff helps with his children by getting them up for school and being home for them when they get home.  Tr. 2, 871.  Plaintiff explained that he does not go to his children's school activities. Tr. 2, 874.  Plaintiff does grocery shopping "to grab a handful of items."  Tr. 2, 874.  While plaintiff enjoys fishing and hunting, he testified that he had not been fishing or hunting in the past couple of years due to shoulder pain.  Tr. 2, 872–73.

III.   **Vocational Expert Opinion**

At the hearing before the ALJ, a vocational expert testified.  The ALJ posed two hypothetical individuals to the vocational expert.

First, the ALJ asked about a hypothetical individual the same age as plaintiff who had the

same education and work history as plaintiff.  This person could occasionally lift 20 pounds, frequently lift 10 pounds, walk or stand six hours in an eight-hour day, occasionally climb, stoop, crouch, kneel and crawl, frequently handle with the right upper extremity and occasionally reach overhead with the right upper extremity; should avoid prolonged exposure to vibrating machinery, and unprotected heights and hazardous moving machinery; is limited to simple, routine, repetitive tasks with occasional interaction with coworkers and occasional interaction with the general public; and can adapt to occasional changes in the workplace and accept occasional supervision. Tr. 2, 879.  The vocational expert testified that this person could not perform plaintiff's past work, but could perform the jobs of marker, router and mail sorter.  Tr. 2, 879.  The vocational expert testified that 305,000 marker jobs, 53,000 router jobs and 41,000 mail sorter jobs exist in the national economy.  Tr. 2, 880.  The vocational expert testified that if this hypothetical individual had to take unscheduled breaks of five minutes or more away from his or her workstation throughout the workday, it would preclude all competitive employment.  Tr. 2, 881.  The vocational expert further explained that these recommendations were based on his own experience as a "vocational rehabilitation professional" because the DOT does not account for overhead reaching, the amount of contact with the public and coworkers and limitations that affect only one arm.  Tr. 2, 880.

The ALJ then posed a second hypothetical to the vocational expert.  This hypothetical person was the same as the first hypothetical, but the individual could not effectively interact with coworkers, the public or supervisors.  Tr. 2, 880–81.  The vocational expert testified that this hypothetical person could not perform any job.  Tr. 881.

## IV.    ALJ Findings

The ALJ denied benefits at step five, finding that plaintiff could perform work that exists

in significant numbers in the national economy.  In his order of March 18, 2020, the ALJ made the

following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.  The claimant has not engaged in substantial gainful activity since March 1, 2013, the amended alleged onset date (20 C.F.R. §§ 404.1571, et seq., and 416.971 et seq.)

3.  The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, right shoulder impingement, carpal tunnel syndrome of the right wrist status post release surgery, obesity, depression, and anxiety (20 C.F.R. 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the following residual functional capacity: he can lift ten pounds frequently and twenty pounds occasionally, sit for six hours out of an eight-hour workday, and stand or walk for six hours out of an eight-hour workday.  He can occasionally climb, stoop, kneel, crouch, and crawl.  He should be limited to occasional overhead reaching with the right upper extremity.  He should be limited to frequent handling with the right upper extremity.  He must avoid prolonged exposure to vibrating machinery. He should be limited to simple routine, and repetitive tasks with occasional interaction with co-workers and occasional interaction with the general public.  He retains the ability to adapt to occasional changes in the workplace and accept occasional supervision.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.  The claimant was born on September 7, 1982 and was 30 years old, which is defined as a younger individual age 18–49, on the amended alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job

skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 2 at 837–850.

## Standard Of Review

The Court must determine whether the Commissioner's decision is free from legal error and supported by substantial evidence.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (quoting Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007)).  It requires "more than a scintilla, but less than a preponderance."  Id. (quoting Lax, 489 F.3d at 1084). Evidence is not substantial if it is "overwhelmed by other evidence in the record or constitutes mere conclusion."  Grogan v. Barnhart, 399 F.3d 1257, 1261–62 (10th Cir. 2005) (quoting Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992)).  To determine if the decision is supported by substantial evidence, the Court will not reweigh the evidence or retry the case, but will examine the record as a whole, including anything that may undercut or detract from the Commissioner's findings.  Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007).

## Analysis

Plaintiff bears the burden of proving disability under the SSA.  See Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).   The SSA defines "disability" as the inability to engage in any substantial gainful activity for at least 12 months due to a medically determinable impairment. See 42 U.S.C. § 423(d)(1)(A).  The Commissioner applies a five-step sequential evaluation to

determine whether the claimant is under a disability: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing his past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. See 20 C.F.R. §§ 404.1520(a)(4), 416.920. If the claimant satisfies steps one, two and three, he will automatically be found disabled; if the claimant satisfies steps one and two, but not three, he must satisfy step four. If step four is satisfied, the burden shifts to the Commissioner to establish that the claimant can perform work in the national economy. See Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988).

The ALJ denied benefits at step five, finding that plaintiff can perform jobs that exist in significant numbers in the national economy. Plaintiff challenges the ALJ's determination of his mental and physical RFCs, as well as the ALJ's step five determination.

## I.    Plaintiff's Mental RFC

The ALJ determined that plaintiff's mental RFC is the following: "[h]e should be limited to simple routine, and repetitive tasks with occasional interaction with co-workers and occasional interaction with the general public. He retains the ability to adapt to occasional changes in the workplace and accept occasional supervision." Tr. 2, 840. Plaintiff argues that substantial evidence does not support this determination. Plaintiff's Initial Brief (Doc. #27) at 29–36.

The ALJ must assess RFC based on all relevant evidence in the record, including information about individual symptoms and any "medical source statements," i.e. opinions by medical sources regarding what plaintiff can do despite his or her impairments. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2, 7 (July 2, 1996). As part of the narrative

discussion of the RFC assessment, the ALJ must explain how he or she considered and resolved any material inconsistencies or ambiguities in the evidence.  Id. at *7.  The RFC assessment must always consider and address medical source opinions.  Id.  If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why he or she did not adopt the opinion. Id.  In making this decision, the ALJ must consider all the evidence, and discuss the evidence supporting his or her decision, the uncontroverted evidence upon which she chooses not to rely and significantly probative evidence he or she rejects.  Clifton v. Chater, 79 F.3d 1007, 1009–10 (10th Cir. 1996).

Substantial evidence supports the ALJ's funding regarding plaintiff's mental RFC. Plaintiff argues that the RFC does not account for mental impairments that the ALJ found at step three.  Specifically, plaintiff argues that the RFC's limitation to "simple, repetitive, and routine tasks" does not account for his moderate limitation in concentration, persistence and pace.  The Tenth Circuit has held, however, that an ALJ may account for moderate non-exertional impairments by limiting claimants to particular types of work activity.  Smith v. Colvin, 821 F.3d 1264, 1269 (10th Cir. 2016).  For example, in Smith, the Tenth Circuit held that an ALJ properly incorporated a moderate limitation in "concentration, persistence, and pace" by concluding that plaintiff "could engage in only simple, repetitive, and routine tasks."  Id.  at 1268–69.  The limitation and the resulting RFC in Smith track squarely with plaintiff's limitation and RFC. Plaintiff argues that Smith is inapposite because a doctor—rather than the ALJ—opined that the plaintiff in Smith had a moderate limitation in concentration persistence and pace.  Fletcher Reply Brief (Doc. #31) at 4.  Plaintiff does not explain why the origin of the opinion is material, and the Court cannot discern why it would be.  Indeed, the question is whether the RFC effectively accounts for each of the moderate limitations.  Here, as in Smith, the ALJ properly accounted for

a moderate limitation in concentration, persistence and pace by limiting claimant to simple, repetitive and routine tasks.

Plaintiff also argues that the ALJ improperly relied on his own medical expertise when determining the RFC. The ALJ considered the opinions of two state agency psychological consultants, Dr. Rosenshield and Dr. Schulman, and two opinions of PMHNP Garton. Tr. 2, 845–46. As discussed above, Drs. Rosenshield and Schulman opined that plaintiff's symptoms would mildly affect his ability to perform work. Tr. 1, 76, 106. On the other hand, Garton opined that plaintiff's symptoms would moderately or markedly affect him in a variety of ways. Tr. 2, 1054–55, 1058–59. After outlining each of the opinions, the ALJ stated that he gave little weight to all of the opinions. The ALJ gave the opinions of Drs. Rosenshield and Schulman little weight because they did not examine plaintiff, could not review subsequently submitted evidence or his testimony, and their opinions were inconsistent with plaintiff's medical records "which document a history of anxiety and depression." Tr. 2, 845. The ALJ gave Garton's opinion little weight because other treatment notes stated that plaintiff had an appropriate, normal, neutral or bright mood and affect, plaintiff's symptoms improved with treatment, Garton's opinion was inconsistent with her treatment notes and plaintiff engaged in a wide range of daily activities. Tr. 2, 847. Plaintiff argues that because the ALJ rejected all of the medical opinions of record, he improperly relied upon his own medical expertise in determining the RFC.

Plaintiff's argument finds no support in case law. Medical opinion evidence does not need to support each part of the RFC. Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012). Indeed, the RFC determination is an administrative, rather than a medical, determination. McDonald v. Astrue, 492 F. App'x 875, 885 (10th Cir. 2012). In determining the RFC, the ALJ may properly find that the RFC fits "between" two medical opinions without fully embracing either one. Smith,

821 F.3d at 1268.  Here, the ALJ did just that.  He found more significant limitations than Drs. Rosenshield and Schulman, but less significant limitations than PMHNP Garton.  He supported his finding with plaintiff's medical record, plaintiff's testimony and the reports of plaintiff's wife. Tr. 2, 839–40, 43–48.  Substantial evidence supports the ALJ's finding regarding plaintiff's mental RFC.

Plaintiff argues that the ALJ had an obligation to further develop the record.  Specifically, plaintiff argues that after the ALJ rejected al medical opinions of record he should have "obtained some medical opinion from an examining or treating physician as to Plaintiff's functional limitations."  Plaintiff's Initial Brief (Doc. #27) at 32.  This argument is without merit.  Plaintiff's argument implies that each portion of the RFC must be supported by medical testimony.  However, the RFC determination does not need to squarely align with a doctor's opinion of plaintiff's functional limitations.  See Chapo, 682 F.3d at 1288.  Moreover, plaintiff's counsel did not request further development of the record.  An ALJ has an independent obligation to further develop the record with a consultative exam only when "evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of a disability."  Hawkins v. Chater, 113 F.3d 1162, 1169 (10th Cir. 1997).  Here, the ALJ reviewed and discussed the medical opinions of record, plaintiff's own testimony, the report of plaintiff's spouse and the medical documentation of record.  Tr. 2, 838–39, 843–46.  These pieces of evidence all discussed plaintiff's functional limitations.  In these circumstances, the ALJ did not have an obligation to further develop the record as to plaintiff's functional limitations because the record was already replete with evidence.

Plaintiff argues that the ALJ improperly rejected nurse Garton's opinions.  The ALJ rejected her opinions because other treatment notes stated that plaintiff had an appropriate, normal,

neutral or bright mood and affect, plaintiff's symptoms improved with treatment, her opinion was inconsistent with her treatment notes and plaintiff engaged in a wide range of daily activities.  Tr. 2, 847.  Plaintiff argues that other portions of his record show abnormal mental status examinations.

Substantial evidence supports the ALJ's decision to give nurse Garton's opinions little weight.  An ALJ may properly discount medical opinions when the opinion is inconsistent with other medical evidence.  Raymond v. Astrue, 621 F.3d 1269, 1272 (10th Cir. 2009).  When the evidence can fairly be read to support two conflicting views, the Court "may not displace the agency's choice" between the two.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).  Here, plaintiff's medical records document improvement with treatment and medication.  Tr. 2, 1105, 1108, 1111, 1149, 1141.  Even portions of the record which plaintiff cites show improvement in his mental health.  See Tr. 2, 1109 (mood cycling does not last long), 1149 (plaintiff "doing better," depression "not quite as bad," medication "is working pretty well").  Moreover, later notes indicate that plaintiff was "doing better" and that his anxiety was under control, his depression was "not too bad," his nightmares were not occurring as frequently and he had no anger outbursts.  Tr. 2, 1151.  At most, plaintiff's record could fairly be read to support two conflicting views.  Substantial evidence supports the ALJ's decision to give nurse Garton's opinions little weight, even if other evidence in the record supports a more favorable result to plaintiff.

## II.    Plaintiff's Physical RFC

The ALJ determined that plaintiff's physical RFC is that he could "lift ten pounds frequently and twenty pounds occasionally, sit for six hours out of an eight-hour workday, and stand or walk for six hours out of an eight-hour workday.  He can occasionally climb, stoop, kneel, crouch, and crawl.  He should be limited to occasional overhead reaching with the right upper

extremity.  He should be limited to frequent handling with the right upper extremity.  He must avoid prolonged exposure to vibrating machinery."  Tr. 2, 840.  Plaintiff argues that the ALJ's determination of his physical RFC is not supported by substantial evidence.

In determining plaintiff's physical RFC the ALJ gave the opinions of Drs. Russo and Kaur "significant weight."  Tr. 2, 846.  Drs. Russo and Kaur opined that plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally, sit for six hours of an eight hour workday, stand and/or walk for six hours of an eight hour workday, frequently balance, stoop, kneel, crouch, crawl and climb ramps or stair, occasionally climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to hazards or vibration.  Tr. 1, 78–72, 122–23.  The RFC reduced some of these abilities, stating that plaintiff could lift 10 pounds frequently and 20 pounds occasionally, occasionally climb, stoop, kneel, crouch, and crawl, and that he should be limited to occasional overhead reaching with he right upper extremity and frequent handling with the right upper extremity.  Tr. 2, 840.  Plaintiff argues that the opinions of Drs. Russo and Kaur were stale, and therefore cannot constitute substantial evidence.  Plaintiff also argues that the ALJ did not give the opinions of Drs. Russo and Kaur "significant weight."  The Court addresses each argument in turn.

Plaintiff argues that the opinions of Drs. Russo and Kaur are not substantial evidence because they were issued five years before the ALJ made his determination.  As a result, plaintiff argues, Drs. Russo and Kaur did not know that plaintiff's diabetes remained uncontrolled and that some of his medications changed.  Fletcher Reply Brief (Doc. #31) at 8.  Plaintiff's diabetes was uncontrolled from 2011 to 2015, when Drs. Russo and Kaur issued their opinions.  Tr. 1, 435, 437, 645, 647, 676, 726.  Plaintiff does not explain how evidence that his diabetes continued to be uncontrolled or that he changed medications would have materially changed the opinions of Drs. Russo and Kaur.  Absent some material change in plaintiff's medical record, five years, standing

alone, is insufficient to show that the opinions of Drs. Russo and Kaur are stale. See Karl v. Saul, No. 19-1119-JWL, 2020 U.S. Dist. LEXIS 133626, at *18 (D. Kan. July 27, 2020) (two-year-old opinions not stale without material change in record). Moreover, the ALJ examined the entire record, including evidence that accrued after Drs. Russo and Kaur issued their opinions. While the ALJ is not a medical source, the ALJ—not a physician—is charged with determining a claimant's RFC based on all of the evidence in the record. Karen Jean M. v. Saul, No. 19-2455-JWL, 2020 WL 5057488, at *5 (D. Kan. Aug 27, 2020).

Plaintiff argues that the ALJ did not give the opinions of Drs. Russo and Kaur significant weight because he moderated their opinions in plaintiff's favor. Specifically, the ALJ moderated the opinions of Drs. Russo and Kaur in plaintiff's favor by limiting plaintiff to lifting ten pounds frequently and 20 pounds occasionally, climbing, stooping, kneeling, crouching, and crawling occasionally and frequently handling with the right upper extremity. Tr. 2, 840. Plaintiff does not explain how the ALJ's moderation results in reversible error. Indeed, the ALJ may properly moderate the opinions of medical experts in favor of the plaintiff and still rely on those opinions. See Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012) (ALJ properly relied on opinion of doctor that he moderated in plaintiff's favor). The Court therefore finds no error in the ALJ's treatment of the opinions of Drs. Russo and Kaur.

## III.   Plaintiff's Step Five Determination

At step five, the ALJ determined that plaintiff could perform jobs that exist in significant numbers in the national economy. Tr. 2, 849. Plaintiff argues that the ALJ erred at step give because the vocational expert testified inconsistently with the DOT. Specifically, plaintiff argues that simple work, to which the ALJ limited plaintiff, is inconsistent with reasoning level two jobs, which the vocational expert recommended. Plaintiff also argues that the jobs recommended by the

vocational expert require "frequent reaching" whereas the ALJ limited plaintiff's ability to reach with his right arm.  The Court addresses each of plaintiff's arguments in turn.

The vocational expert testified that plaintiff could perform the jobs of marker, router and mail sorter.  Tr. 2, 880.  Of these, 305,000 marker jobs exist nationally, whereas 53,000 router jobs and 41,000 sorter jobs exist nationally.  Tr. 2, 880.  All three jobs have a level two reasoning level, which requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables or from standardized situations."  Tr. 2, 880; 1991 WL 688702.

Plaintiff argues that the requirements of these jobs conflict with the ALJ's limitation that plaintiff may only perform "simple, routine, and repetitive tasks."  Tr. 2, 840.  In support, plaintiff cites a series of cases from this district where the Court remanded cases because of an unaddressed conflict between level two's requirement that the claimant be able to carry out detailed instructions and a claimant's limit to understanding, carrying out and remembering simple work instructions. See  McDonald v. Berryhill, No. 16-2594-SAC, 2018 WL 806221, at *4 (D. Kan. Feb. 9, 2018); Dugan v. Berryhill, No. 17-2165-SAC, 2018 WL 1400448, at *5–6 (D. Kan. Mar. 20, 2018); Johnson v. Berryhill No. 16-4185-SAC, 2017 WL 6508944, at *8–9 (D. Kan. Dec. 20, 2017). These cases do not support plaintiff's position because his RFC does not limit his ability to understand instructions.  Instead, plaintiff's RFC requires a limit to "simple, routine, and repetitive tasks."  Tr. 2, 840.  As the Tenth Circuit noted in Stokes v. Astrue, 274 F. App'x 675, 684 (10th Cir. 2008), a limitation to "simple, repetitive and routine work" does not conflict with a reasoning level rating of two.  Because the RFC does not limit plaintiff's ability to understand instructions, the vocational expert properly testified that he could perform jobs with a reasoning level of two.

Finally, plaintiff argues that the vocational expert's testimony conflicts with the ALJ

findings regarding his physical RFC.  Specifically, plaintiff argues that the jobs cited by the vocational expert require frequent reaching, whereas his RFC limits him to occasionally reaching overheard with the right upper extremity.  Plaintiff's Initial Brief, (Doc. #27) at 37.  If the vocational expert testifies inconsistently with the Dictionary of Occupational Titles ("DOT"), the ALJ must elicit a reasonable explanation about the conflict before the ALJ can rely upon the vocational expert's testimony as substantial evidence.  Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999).  Plaintiff's argument, however, is without merit.  The ALJ specifically asked the vocational expert whether overhead reaching is covered by the DOT.  Tr. 2, 880.  The vocational expert responded that the DOT does not address overhead reaching but that based on [his] experience as a vocational rehabilitation professional," plaintiff could still do the listed jobs.  Tr. 2, 880. Supplementing the DOT, which contains a broad range of abilities and positions in the national economy, is the purpose of vocational expert testimony.  Robert Lee M. v. Saul, No. 18-2444-JWL, 2019 WL 3079384, at *16 (D. Kan. July 15, 2016); Segovia v. Astrue, 226 F. App'x 801, 804 (10th Cir. 2007) (even job requiring frequent reaching does not necessarily require more than occasional overhead reaching).  Because the vocational expert addressed any conflict, the vocational expert's testimony constitutes substantial evidence.

IT IS THEREFORE ORDERED that the final decision of the Commissioner is AFFIRMED.

Dated this 27th day of August, 2021 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge